[Civ. No. 26268. Second Dist., Div. One. Nov. 5, 1962.]

JAMES WILLIAM SPEER, Plaintiff and Appellant, v. MARGARET LILLIAN SPEER, Defendant and Respondent.

Walter H. Young and Booth H. Bowers for Plaintiff and Appellant.

Bailie, Turner, Lake & Sprague for Defendant and Respondent.

LILLIE, J.—Plaintiff husband appeals from a judgment denying him a divorce and granting defendant wife a decree of separate maintenance as prayed for in her cross-complaint. In addition to an award of permanent support, the decree also divided the property of the spouses between them and contained other provisions which are here challenged.

The parties were married in 1936 and separated in 1957. The present action was instituted in January of 1958, and the judgment appealed from was entered on April 17, 1961—the delay incident to the culmination of the trial is likewise made the subject of plaintiff's criticism. Differences arose rather early in the marriage. We mention a few which, according to the plaintiff, reveal such an unwholesome relationship that its perpetuation would be a mockery of marriage. (*DeBurgh* v. *DeBurgh,* 39 Cal.2d 858, 867 [250 P.2d 598].)

First, plaintiff complains that he was generally unable to have satisfactory marital relations for several stated reasons; however, it appears that plaintiff knew of these matters before the marriage and it further appears, at least by inference, that he was generally not too dissatisfied with the situation. In 1940 the parties moved to a small house on Twickingham Avenue, Los Angeles, where they continuously resided until their separation. With them moved defendant's mother at whose home the parties had theretofore lived. The mother did most of the cooking and ironing, and all of the mending. The house was so crowded that it became necessary to convert a stall shower into a storage closet. During this time the parties had dogs, of various breeds and five to eight in number, living with them. Two were males which fought with each other; certain rooms in the house had to be partitioned off to keep the dogs from fighting. All the dogs slept in the house; whenever there was an unusual noise (and this happened almost nightly) they would bark—always in unison. On several occasions defendant threatened suicide when plaintiff complained about getting rid of the dogs. There were two beds in the bedroom. Defendant moved out of this room about 15 years prior to the separation; thereafter she slept in the den with the dogs. During the last year of their life together,

she denied him intercourse. Plaintiff usually returned from work at 6 o'clock. He ate his meals on a chair with the plate on his lap; defendant ate her meals in the den. The mother usually prepared the meals; she ate off the breadboard. There was also testimony that defendant was not a good housekeeper in other respects. The overall picture presented, if believed by the trier of fact, would indeed suggest that, "the purposes of family life [were] no longer served and divorce [should] be permitted." (*DeBurgh* v. *DeBurgh, supra,* 39 Cal.2d 858, 864.)

On the other hand, plaintiff expressly concedes that there was "much disputed evidence" on the matters heretofore related; specifically, whether plaintiff complained about "the foregoing items," whether defendant actually refused him intercourse, whether defendant was or was not a good housekeeper—to mention a few. In this connection, it appears that plaintiff was not altogether unhappy about the fact or extent of the canine companionship with which he was daily (and nightly) confronted; in 1937 he bought defendant their first dog as a Christmas present, and another dog was purchased when the parties thereafter decided to raise puppies and sell them. The trier of fact was also entitled to infer that plaintiff ate his meals in the manner already described because, like many other normal persons, he was a devotee of television and watched these programs while seated in a special reclining chair.

In the last analysis, therefore, it seems that this particular phase of the appeal is controlled by the principle that "considerable latitude is allowed to the [trial] court in determining whether such acts constituted extreme cruelty of the nature and kind to make mandatory a severance of the marital bonds." (*Polk* v. *Polk,* 50 Cal.App.2d 653, 656 [123 P.2d 550].) After stating that the trial court is aided by the opportunity of having the witnesses before it and observing their candor and truthfulness, the *Polk* case declares: "Whether in a given case the conduct of one of the spouses was such as *wrongfully* to inflict upon the other party to the marriage the 'grievous bodily injury' or 'grievous mental suffering' referred to in the statute, is a pure question of fact, to be deduced from all the circumstances of each particular case, and as stated in *Van Camp* v. *Van Camp,* 53 Cal.App. 17 [199 P. 885], 'no arbitrary rule of law as to what particular probative facts shall exist in order to justify a finding of the ultimate facts of its existence can be given.' " (P. 657.)

█ Too, "On appeal from a judgment in a divorce action, as in other actions, every intendment is in favor of the findings made by the trial court." (*Manzanares* v. *Manzanares*, 190 Cal.App.2d 771, 778 [12 Cal.Rptr. 239].) With one exception (to be presently noted) plaintiff's whole argument, extensively and vigorously pursued, simply "splinters on the familiar rock that the trial court resolves such questions of fact and that the findings will not be disturbed if supported by substantial evidence." (*Clevenger* v. *Clevenger*, 189 Cal. App.2d 658, 675 [11 Cal.Rptr. 707].) █ Here the findings of plaintiff's cruelty and misconduct are sufficiently supported by the evidence.

There is this somewhat singular situation in the present case, as plaintiff points out. Since *DeBurgh, supra* (39 Cal. 2d 858), it has been both proper and common to grant a divorce to both parties when the circumstances warranted. One of the problems argued pro and con, from the trial's inception to its end, was the authority of the court to grant a divorce and separate maintenance in the same action. Plaintiff concedes that no case, directly in point, for the unprecedented step he asked the trial court to take has been found. However, at several sessions the trial judge indicated that "there should be a complete divorce here, no matter what is done"; but always recognizing the problem "whether or not divorce and separate maintenance can be granted at the same time." Defendant persisted in her prayer for separate maintenance, she did not ask for a divorce; on the other hand, plaintiff prayed for a divorce. Finally, after much colloquy, the trial judge said that "a very substantial divorce cause was presented by the wife" and indicated he would grant her decree of separate maintenance. Plaintiff argues, however, that it was the lower court's doubt that the law would support the granting of a divorce and a separate maintenance in the same action, not the weakness of his case in chief that motivated the trial court's action in denying him a divorce. █ But this is not true for it is apparent from the evidence, the findings of the trial judge and the court's statement to the parties, that on the evidence plaintiff was not entitled to a divorce; thus the "comparative guilt" of the parties mentioned in *DeBurgh* v. *DeBurgh*, 39 Cal.2d 858 [250 P.2d 598], has little bearing on the case at bar. It is important to note, that the *DeBurgh* opinion does not compel an award to both parties in all cases of dual marital fault. See, for example, *Mueller* v. *Mueller*, 44 Cal.2d 527, 530 [282 P.2d 869], where the court

(citing *DeBurgh*) declared that, "The comparative guilt of the parties 'may have an important bearing upon whether or not either or both should be granted . . . .' '" Implicit in the comments of the court, just quoted and to follow, is the recognition of this factor of comparative guilt: ". . . it seems to the court that the case is a one-sided case from the standpoint of the defendant and cross-complainant and I would think regardless of this attempt of showing adultery, which I assume could have been gone into more thoroughly except that the court more or less restricted proof on that subject, the issue of cruelty is directly proved." Continuing, "I think that the evidence of association with another woman while the plaintiff was still married and is still married to the defendant here, created a situation that was intolerable from the standpoint of any person with normal sensibility and reactions. If he had just walked out, having become fed up, so to speak, with the situation to the extent that he could no longer stand it, we could possibly recognize that as a reaction that might be anticipated, but the walking out and getting surfeited with the kind of existence he said he led seemed to have developed quite spontaneously, if not spontaneously, at least fairly rapidly after he encountered Mrs. M. . . ." Accordingly, Finding VI is to the effect that "at various places since April of 1957, plaintiff has committed adultery with one (naming her) within the County of Los Angeles, State of California."

In the exercise of sound discretion, therefore, the court could have granted a divorce to the wife, had she sought such relief. Plaintiff admitted to defendant in August of 1957 that there was a liaison between himself and the woman named in the cross-complaint; this was some three months before the date of separation which, according to plaintiff's complaint, occurred on November 15, 1957. Too, there was evidence of activities indicating an adulterous disposition (at the very least) which supports a general charge of cruelty. (*San Chez* v. *Superior Court*, 153 Cal.App.2d 162, 164 [314 P.2d 135].) Even if it be conceded that these activities took place after the separation, such evidence was admissible for corroborative purposes. (*Garten* v. *Garten*, 140 Cal.App.2d 489, 492 [295 P.2d 23].) There is no merit, of course, to plaintiff's argument that the co-respondent was never served with a copy of the pleadings; the governing statute (Code Civ. Proc., § 1019) limits the above requirement to an action for divorce. (*San Chez* v. *Superior Court, supra,* 164-165)

Moreover, the trier of fact freely expressed his opinion that plaintiff had in fact failed to establish his case. The court said: ''Well, as a matter of fact, I have never considered that the plaintiff had an action for divorce here based on the evidence presented . . . I have sometimes wondered at his courage, if that is a proper word, in filing an action for divorce in view of the situation in which he found himself.''

For the above reasons we conclude that whether, as a matter of law, relief could have been granted to each party—a divorce to the husband and separate maintenance to the wife—is really an academic question undeserving of further discussion here.

Plaintiff challenges the determination below respecting the character of certain properties, the disposition of property found to be community, the amount of alimony awarded and the fees (said to be excessive) awarded defendant's attorneys. We shall first consider the last two contentions.

Plaintiff was ordered to pay alimony at the rate of $250 bimonthly. A certified public accountant, appointed by the court, testified (after access to pertinent books) that plaintiff's monthly salary from a wholesale meat business known as Day-Lee Meats, Inc. was slightly over $1,000 per month.

In this connection, it appears that plaintiff also owns a one-half interest in Day-Lee Meats, a copartnership, out of which the above corporation was formed. The trial court found that plaintiff and defendant were 50 and 49 years of age respectively; that defendant had undergone surgery for various ailments and has neither the ability nor training to support herself. In view of defendant's established needs, it may not be said that the sum awarded is unreasonable provided it is within plaintiff's ability to pay; this is particularly true in light of the length of marriage. Difficulty is encountered, however, when consideration is given to plaintiff's ability to pay at the time of entry of the judgment.

According to defendant, as of May 31, 1960, the corporation's assets reflected in the balance sheet aggregate slightly in excess of $189,000. Offsetting these assets are obligations of $60,000 approximately, listed as accounts receivable, due plaintiff and his partners as officers. A further receivable, owed to the partnership, totals approximately $63,000. According to the capital account, there is no issued capital stock. Retained earnings total $18,381.98. Without further statement of financial figures, defendant says that plaintiff owns a one-half interest in each of the two accounts receivable, mentioned above, as well as a one-half interest

in the retained earnings. ($18,381.98.) Plaintiff was ordered to pay to defendant for her share of the parties' community interest therein the sum of $25,200 in monthly installments of $700 for a period of 36 months.

But neither the corporation nor the partnership were made parties to the present action, nor is it claimed that the corporation was plaintiff's *alter ego*. Mr. Marks (plaintiff's partner) was a co-owner, and the corporation is as much indebted to him as to plaintiff. Too, the record appears to be silent as to when the accounts receivable to Marks and plaintiff were due or the ability of the corporation to pay them. There is the further difficulty of creditors' claims, actual or contingent. It was suggested by defendant's counsel at the trial's closing session, that plaintiff could ''factor his accounts receivable or assign them and get some money out of it.'' But, as stated in plaintiff's reply brief, this suggestion ''completely disregarded the corporation, disregarded Mr. Marks, amounted to a conversion of corporate assets to pay personal debts of a shareholder and treated the business as though it were the sole property of Mr. Speer.'' In short, the judgment ordered plaintiff to make specific payments as and for alimony, attorneys fees and other costs, leaving it to him to determine how the necessary monies were to be secured or, as further noted in plaintiff's brief, ''how he would make peace with Mr. Marks, if this were possible.''

The law is clear that in dividing property incidental to the granting of a divorce decree, the court is limited by the amount of property in its hands for division. (*Hill* v. *Hill*, 82 Cal.App.2d 682 [187 P.2d 28].) Plaintiff has a mere expectancy in the assets of the Day-Lee operation; such expectancy is not subject to division as community property. (*French* v. *French*, 17 Cal.2d 775, 778 [112 P.2d 235, 134 A.L.R. 366].) Until his present claims against the business are made enforceable by an accounting or other appropriate proceeding, they remain a mere expectancy. Incidentally, it has been represented to us, although no part of the record, that such a suit is presently pending.

While the foregoing discussion relates to the determination and disposition of the parties' property, it also bears on the award of alimony. Defendant's argument in support of the reasonableness of such award is premised on the assumption that plaintiff had certain liquid assets, additional to his salary, which established his ability to pay. We have determined otherwise. It also appears that plaintiff was ordered

to pay past-due federal income taxes in the sum of $12,000 and other obligations (including attorney's fees) aggregating more than $19,000. ▮ Manifestly it is impossible for plaintiff with a monthly salary of $1,000 to pay the sum awarded for permanent support unless other creditors are to be disregarded. Upon retrial or following the outcome of other litigation marshalling the assets of the community in the Day-Lee enterprise, the award in question may prove reasonable; in the present state of record, however, it is not.

The same conclusion must be reached with respect to the matter of attorney's fees. Counsel were awarded $7,000 representing several hundred hours of work. We do not question the hourly or daily court rate charged; but the results of this litigation have been inconclusive, and one of the factors determinative of an attorney's fee is the result achieved. The portion of the judgment fixing such fees must also be reversed.

▮ Save for that portion of the judgment which determined defendant's interest in the Day-Lee operation, the only other challenged provisions dispositive of the parties' property interests relate to Lot 97 (on East Beverly Boulevard) and the assignment to defendant of a homestead on the Twickingham house, being Lot 216 of Tract 4777. When defendant filed a homestead, there was included in her declaration an adjoining lot—Lot 215. The sole question is whether this contiguous lot was utilized in connection with the enjoyment of the house on Lot 216. Photographs and other evidence were introduced which showed such use. The trial court's finding was proper and in accord with established precedent. (*Englebrecht* v. *Shade*, 47 Cal. 627.)

▮ With respect to Lot 97, it appears that this property was originally held by the parties in joint tenancy. Subsequently, plaintiff deeded his interest to a third party who, as a consequence, became a tenant in common with defendant. Thereafter this grantee deeded her interest back to plaintiff— evidence of this conveyance, although perhaps not the best evidence, was received without objection (Deft. Ex. "AA"). *Dunn* v. *Mullan*, 211 Cal. 583 [296 P. 604, 77 A.L.R. 1015], is controlling. That case holds that where, as here, there is no evidence as to the source of funds procuring the second conveyance, the presumption created by statute (Civ. Code, § 164) must prevail; namely, one joint tenant (the wife) held an undivided one-half interest therein as her separate property, while the remaining half was the community property of the husband and wife. The trial court correctly so held.

Insofar as the judgment awards $500 per month permanent support, fixes attorney's fees, declares that there is a community interest in the corporation and partnership known as Day-Lee Meats, Inc. and Day-Lee Meats and orders plaintiff to pay defendant the sum of $25,200 as her share thereof, it is reversed; in all other respects, it is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied December 3, 1962, and respondent's petition for a hearing by the Supreme Court was denied January 3, 1963.